# IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NORTH CAROLINA
## NORTHERN DIVISION, RALEIGH
## FILE NUMBER

| | |
|---|---|
| **Kenisha Gregory** and **Humble Beginnings Child Care, Inc**., <br><br> Plaintiffs, <br><br> v. <br><br> **Currituck County, Currituck County Department of Social Services, State of North Carolina Department of Health and Human Services, Kathy Romm, Carla Mebane, Marjorie White, James Mims,** and **Bill Newns,** <br><br><br><br> Defendants. | **COMPLAINT FOR DAMAGES** <br><br> **JURY TRIAL DEMANDED** |

## COMPLAINT FOR DAMAGES

NOW COMES Kenisha Gregory ("Plaintiff Gregory" or "Individual Plaintiff") and Humble Beginnings Child Care, Inc. ("Plaintiff" or "Humble Beginnings") (collectively "Plaintiffs"), by and through undersigned counsel, to file this Complaint against the above-named Defendants and in support thereof states as follows:

## INTRODUCTION

This case highlights continuous-systemic-institutional racism, initiated by Currituck County Department of Social Services ("DSS") in conjunction with Currituck County (the "County"), State of North Carolina Department of Health and Human Services ("DHHS"), Kathy Romm ("Defendant Romm"), Carla Mebane ("Defendant Mebane"), Marjorie White ("Defendant White"), James Mims ("Defendant Mims"), and Bill Newns ("Defendant Newns") (collectively "Defendants"). As a cohesive unit, Defendants acted under color of state law to put Plaintiff Gregory, who is an African-American woman, and Humble Beginnings because it was owned by an African-American woman, "in an African-American's place" because of race. In fact, Plaintiffs were safe and free from discrimination until they decided to grow to become the largest child care center in Moyock, North Carolina, exceeding that of White-owned businesses. When Plaintiffs expanded their vision, Defendants implemented their plan to show them that African-Americans are not to succeed at a rate greater than White counterparts in that Southern town. From 2012, until its dissolution on June 30, 2018, Defendants interfered with Plaintiffs' business to force dissolution. In the process thereof, Defendants openly refused to afford Plaintiffs the same treatment as White childcare center owners. Defendants discriminated in its pay to Plaintiffs; it capped Plaintiffs' receipts and expansion discriminatorily. Defendants discriminated in their regulation of Plaintiffs; they scrutinized Plaintiffs' facility discriminatorily. When Plaintiff Gregory questioned Defendants' discriminatory practices, Defendants utilized all of their resources to run her out of business, and even

initiated felonious felony criminal proceedings to ensure that she would never operate a childcare facility in North Carolina again. As a result of Defendants' discrimination, Plaintiffs suffered and continues to suffer, severe mental anguish, severe emotional distress, financial loss, as well as pain and suffering. Plaintiffs seek all damages allotted under the law.

## JURISDICTION AND VENUE

1. This action is based on race discrimination in violation of Title 42 of the U.S. Code, which is part of the Civil Rights Act of 1871; 42 U.S. Code §§ 1983 and 1981. Federal courts have federal question jurisdiction over these claims under 28 U.S.C. § 1331. Federal courts have jurisdiction over the state law claims under supplemental jurisdiction as defined in 28 U.S.C. § 1367. These state law claims are based on a common nucleus of operative facts as the underlying federal claims. Defendants' intentionally unlawful, discriminatory, and tortious conduct complained of herein occurred in this district.

## PARTIES

2. Plaintiff **KENISHA GREGORY** is an African American citizen of the United States and a resident of the State of North Carolina. As a high school student, Ms. Gregory trained under the mentorship of a licensed child care provider. Ms. Gregory then obtained an Associates Degree in Child Development from the local community college. Plaintiff Gregory now holds two Bachelors' of Science Degrees in Education and Birth to Kindergarten from Elizabeth City University. Plaintiff Gregory had no other skill than child care services.

3.      Plaintiff **HUMBLE BEGINNINGS CHILDCARE, INC.**, was incorporated by an African American woman in the state of North Carolina and its principal place of business is in North Carolina.  Plaintiff Gregory formed Humble Beginnings in 2007, and operated it out of her private residence in Moyock, North Carolina, as a licensed family child care home provider.  In December 2009, Plaintiff Gregory moved Humble Beginnings to a center and operated it as a licensed family child care center. In 2012, Ms. Gregory relocated Humble Beginnings to an even larger facility located at 268 Caratoke Highway, Moyock, North Carolina (the "Facility or Property").

4.      At all times relevant hereto, Defendant **CURRITUCK COUNTY, NORTH CAROLINA**, is a North Carolina body politic and corporate, created by the General Assembly of North Carolina.

5.      At all times relevant hereto, Defendant **CURRITUCK COUNTY DEPARTMENT OF SOCIAL SERVICE** is a department within Currituck County, North Carolina.  Every county in North Carolina has a Department of Social Services. Each county receives an annual allocation of childcare funding for its respective county DSS. The Currituck County Department of Social Services, controls and allocates funds to child care provider in Currituck County to subsidize payment for the dues and financial responsibilities of families unable to pay for the services.

6.      At all times relevant hereto, Defendant **NORTH CAROLINA DEPARTMENT OF HEALTH AND HUMAN SERVICES**, is a department

organized under North Carolina General Statute §143B-138.1. Subsidized childcare services in the State of North Carolina are provided with federal and state funds. The Division of Child Development ("DCD") is formed by DHHS and administers both types of funding.

7.     At all times relevant hereto, Defendant **KATHY ROMM** was a citizen of the United States and a resident of the State of North Carolina and was acting under color of state in her capacity as the Director of Currituck County Department of Social Service. DSS is the Local Purchasing Agency ("LPA") for Currituck County. The LPA is responsible for administering the state's subsidized child care program in its respective county.  At all times relevant to this action, DSS was maintained and overseen by Defendant Romm, Director of Currituck Department of Social Services and was a "policymaker" for DSS and Currituck County, whose actions are imputed to the County under *respondent superior*.

8.     At all times relevant hereto, Defendant **CARLA MEBANE** was a citizen of the United States and a resident of the State of North Carolina and was acting under color of state in her capacity as the Supervisor for the Currituck County Department of Social Service, whose actions are imputed to the County under *respondent superior*.

9.     At all times relevant hereto, Defendant **MARJORIE WHITE** was a citizen of the United States and a resident of the State of North Carolina and was acting under color of state in her capacity as the Licensing Consultant of North Carolina Department of Social Service.  As a Licensing Consultant, Defendant

White oversaw and monitored licensed child care providers and reported her findings to her supervisor Lois Harrington ("Ms. Harrington"). She is a consultant and employee of DHHS, whose actions are imputed to it under *respondent superior*.

10.     At all times relevant hereto, Defendant **JAMES MIMS** was a citizen of the United States and a resident of the State of North Carolina and was acting under color of state in his capacity as the Fire Marshall for Currituck County. Defendant Mims inspected buildings to determine if the property complied with the county's fire code. And was a County employee, whose actions are imputed to the County under *respondent superior*.

11.     At all times relevant hereto, Defendant **BILL NEWNS** was a citizen of the United States and a resident of the State of North Carolina and was acting under color of state in his capacity as the Chief Building Inspector for Currituck County, and as such his actions are imputed to the County under the doctrine of *respondent superior*. Defendant Newns inspected buildings to determine if the property complied with the county's building code.

## BACKGROUND FACTS

12.     DHHS regulates the licensure requirements of child care centers in the State of North Carolina.

13.     Child care requirements ensure that programs are meeting the minimum standards for care in North Carolina. Programs must maintain a compliance history of 75% for the past 18 months or the length of time the facility has operated.

14.     Licenses are ranked on a star basis, with five (5) being the highest rank. The star-rated license system recognizes facilities for their voluntary efforts to exceed these minimum standards.

15.     Subsidized childcare services in the State of North Carolina are provided with federal and state funds. The DCD administers both types of funding.

16.     Every county in North Carolina has a DSS. Each county receives an annual allocation of childcare funding for its respective county DSS.

17.     DSS controls and allocates funds to child care provider in Currituck County to subsidize payment for the dues and financial responsibilities of families unable to pay for the service.

18.     Violations by DSS may result in sanctions against daycare providers up to the termination of receiving subsidies from the DSS for families unable to pay for childcare services.

19.     All Violations by DSS are for public view, may result in sanctions against a daycare provider up to the termination of receiving subsidies from the DSS for families unable to pay for childcare services.

### *Humble Beginnings*

20.     Humble Beginnings was a childcare center in Currituck County that received allocated funds to subsidize payment for the dues and financial responsibilities of families unable to pay for Humble Beginnings' child care services.

21.     At least fifty (50) percent of all families who requires child care services in Currituck County receive subsidies from the DSS.

22.     Humble Beginnings was owned and operated by Plaintiff Gregory, an African American woman. Humble Beginnings was opened in 2007, and run out of Plaintiff Gregory's home. In December 2009, Plaintiff Gregory transitioned Humble Beginnings from a licensed home provider to a licensed center child care provider and relocated Humble Beginnings to 304 Poyners Road, Moyock, North Carolina. In 2012, relocated Humble Beginnings to the Facility.

23.     There are approximately eleven (11) privately owned daycare providers in Currituck County, NC.

24.     Humble Beginnings is one of two (2) African-American privately owned daycare providers in Currituck County, NC. The other African-American owned private daycare provider is New Beginnings.

25.     The remaining privately owned daycare providers are White/Caucasian owned.

26.     Humble Beginnings was the largest privately own childcare center in Currituck County and serviced more children than any other privately own childcare provider in Currituck County.

### Compliance History and Beginning of Interference

27.     In 2007, when Plaintiff Gregory opened Humble Beginnings, and operated it out of her private residence in Moyock, North Carolina, as a licensed family child care home provider, DHHS rated Humble Beginnings at three (3) stars.

28.     Plaintiff Gregory operated two shifts and was allowed to enroll eight (8) children on both shifts, for a total of 16 children.

29.     Plaintiff Gregory was assigned a consultant named Lana Neal ("Consultant Neal"); she was White, equitable and respectful.

30.      Consultant Neal visited Plaintiffs' facility about once per year and issued passing compliance rates and history.

31.     Consultant Neal encouraged Plaintiff Gregory to open her own public childcare facility, treated Plaintiff Gregory with respect and as an equal citizen.

32.     In December 2009, Plaintiff Gregory transitioned Humble Beginnings from a licensed home provider to a licensed center child care provider as inspired by Consultant Neal. Humble Beginnings still had a three-star rating.

33.     This location was two (2) buildings with four classrooms. Plaintiff Gregory employed five (5) staff members.

34.     There, Plaintiff Gregory was licensed for thirty-six (36) children on each shift. Humble Beginnings had a full waiting list of more than twenty (20) children.

35.     Consultant Neal remained Plaintiff Gregory's consultant.

36.     Consultant Neal visited Plaintiffs' facility about once per year and issued passing compliance rates and history.

37.     Around 2010, Consultant Neal retired and DHHS assigned Defendant White to serve as Plaintiffs' consultant.

### *Defendant White Exhibited Racial Animus*

38.     Plaintiff Gregory immediately noticed the difference in treatment by Defendant White. Defendant White was distant, did not support Plaintiffs' growth

and expansion, interacted with staff and children differently along racial lines, seemed indifferent, treated her with disdain and disregard, heavily scrutinized her and searched for violations. Defendant White was outwardly racist and discriminated against Plaintiffs in every way because of race.

39. Defendant White:

a. Talked to Plaintiff Gregory in a demeaning manner, chastised her and ordered her around like a child. Defendant White seemed most pleased with Plaintiff Gregory when Plaintiff Gregory tolerated such demeaning behavior, remained silent, held her head low and did not look her in the eyes.

b. Threatened to take Plaintiff Gregory's license as a sanction on multiple occasions to exert her authority and subordinate Plaintiff Gregory.

c. Unfairly criticized Plaintiff Gregory and critiqued her Facility.

d. Was polite to Plaintiffs' White employees and staff, but talked down to the African-American employees and staff in a demanding and authoritative manner.

e. Interacted with the White children who were enrolled at the Facility (told them that they were cute and pinched their cheeks), but did not interact with the African-American children who were enrolled at the Facility; she did not even smile at or speak to the African-American children.

f. Spoke to Plaintiff Gregory in a demeaning manner in front of Facility staff, but did not speak to White owners in a demeaning manner.

g.      Informed Plaintiff Gregory to cook the food for White-owned facilities, and conditioned retention of her license on such cooking.

h.      Diverted White children from Plaintiffs to White-owned facilities.

i.      Did not pay African-American owned facilities equitably for mileage.

j.      Brought toys and other items to White-owned facilities and no toys, only rude attitudes, to African-American owned facilities.

40.     Defendant White knew that her extended stays at the Facility and critiques were inequitable because when she was accompanied by other DHHS workers, she altered her behavior and only remained at the Facility for one hour or so.

41.     In 2011, Defendant White conducted approximately two (2) visits. Plaintiff Gregory requested that her license be re-rated because she had everything to be a four (4) star facility; Defendant White declined.

42.     In 2012, Plaintiff Gregory relocated Humble Beginnings to the Facility. The Facility was four (4) to five (5) times larger than the prior facility, and so Plaintiff Gregory was licensed to care for a total of 68 children on first and second shifts.

43.     Defendant White continued to interfere with Plaintiffs' business. Defendant White:

a.      Capped Humble Beginnings at a three-star rating.

b.      Harassed Plaintiffs.

c.      Made six (6) visits in one year.

d. Would stay all day long for visits, from open to early evening.

e. Required Humble Beginnings to make unnecessary improvements to the Property.

44. Defendant White continued to serve as Plaintiffs' consultant and in 2013, made approximately two (2) visits to the Facility. Defendant White had to re-rate the Facility pursuant to statutory guidelines, and when she did, DHHS issued Plaintiffs four (4) stars.

45. Defendant White returned in 2014, to conduct an annual review. Defendant White stayed from early in the morning to early in the evening. The Facility received a compliant score and history.

46. During this visit, Defendant White questioned Plaintiff Gregory about her personal life. Plaintiff Gregory explained that she did not mix personal with business. Defendant White took Plaintiff Gregory's response as an indication that she had stepped outside of the "place" of an African-American. In response, Defendant White began to show Plaintiff Gregory that she was to be subordinate, subject to her review power and authority as a white overseer.

47. When Plaintiff Gregory reported Defendant White's discriminatory conduct, Defendant White then began a series of discriminatory and retaliatory acts, aimed at subordinating Plaintiff Gregory and utilized all entities at her disposal.

48. As an African-American, Plaintiff Gregory has been disenfranchised and was subject to Defendant White's dominion and control.

49. In 2014, Plaintiff Gregory attempted to expand her business ventures even more. She leased a building and petitioned for a license to grow an after-school center for older children, located at the Margie Seymore Community Center ("MSCC"), 113 Baxter Lane, Moyock, NC 27958. Defendant White commissioned Defendants to block Plaintiff Gregory's growth at every turn, and Defendants did.

### Unannounced Visits and Unsubstantiated Violation
### (Disparate Treatment by Defendants)

50. Defendant White set a plan in motion to run Plaintiffs out of business because she did not believe that an African-American woman was *entitled* to a facility such as Humble Beginnings, and she sought to put Plaintiff Gregory back in an African-American's appropriate place.

51. In an effort to do so, Defendant White began to unfairly scrutinize Plaintiffs, starting in 2014 until 2018.

52. When Plaintiffs relocated Humble Beginnings to the Facility, Defendant White inequitably oversaw operations. Plaintiffs were subjected to twenty-nine (29) unannounced visits by the DHHS in a span of a year in 2014 and twenty-three (23) unannounced visits in 2015. Majority of the unannounced visits were just days apart.

53. Defendant White continued the practice of unfairly scrutinizing and reviewing Plaintiffs and conducting unannounced visits at late as of April 2018, by the DSS.

54. On several occasions where Humble Beginnings was subjected to an unannounced visit, unsubstantiated violations were alleged by DSS.

55.     In some instances, White/Caucasian privately owned daycare providers were only subjected to either announced or unannounced visits by DSS once or twice per year.

56.     All White/Caucasian privately owned daycare providers had *de minima* visitations and violations, both announced and unannounced by DSS since their commencement.

57.     By contrast, New Beginnings, Currituck County's only other African-American owned private daycare provider, has been subjected to twenty-three (23) unannounced visits from January 11, 2016, to July 9, 2018.  Such unannounced visits far exceed all White/Caucasian privately owned daycare providers' unannounced visits on a 4:1 ratio.

58.     Humble Beginnings and New Beginnings have been disproportionately cited with violations in comparison to their White/Caucasian counterparts by DSS under the direction of Defendant Romm.

59.     Furthermore, a majority of DSS' cited violations against Humble Beginnings were meritless and were utilized as a means to discredit Humble Beginnings as a formidable licensed daycare provider to the public.

60.     In addition, Defendant White illegally searched Plaintiff Gregory's vehicle absent consent or warrant.

61.     Plaintiffs reported these discriminatory visits and Defendant White's discriminatory acts to DHHS, and DHHS did not otherwise respond.

### *DSS and its Agents Harassed and Intimidated Plaintiffs*

62.     DSS wrongfully accused Plaintiff Gregory of violations to mark her unblemished record.

63.     DSS, without any substantiated proof, accused Plaintiff and Humble Beginnings of caring for fourteen (14) subsidized children at an unlicensed facility.

64.     Despite Humble Beginnings' denial and DSS' lack of evidence that the aforementioned children were being cared for at an unlicensed facility, DSS fraudulently recouped over $14,000.00 from Plaintiff.

65.     Defendant Romm coerced Plaintiff to enter into a repayment plan by threatening Plaintiff Gregory that she would call the District Attorney and have Plaintiff Gregory arrested and charged with fraud and running a business without a license, and that she would ensure Humble Beginnings would be closed permanently.

66.     Defendant Romm was fully aware at the time when she coerced Plaintiff Gregory to enter into a repayment plan, that Plaintiff Gregory did not engage in any fraudulent activity, and in fact, DSS and Defendant Romm acknowledged that Plaintiff Gregory was not liable of an Intentional Program Violation ("IPV") under the rules of DSS.

67.     Plaintiffs agreed to enter into a repayment plan under duress and solely to continue to operate her business and to care for subsidized children in Currituck County.  Nevertheless, despite fundraising efforts, Plaintiff Gregory was unable to continue to care for the number of children before DSS recoupment of payment due to the fraudulent actions by DSS.

68.     Plaintiffs appealed the recoupment to the DSS and the Office of Administrative Hearings ("OAH"); but OAH held that the claim was procedurally defaulted, leaving Plaintiffs with no administrative remedy.

69.     Additionally, on multiple accounts, DSS and Defendant Romm knowingly and intentionally diverted subsidy children from Humble Beginnings to White/Caucasian daycare providers by providing false information to subsidy families who wanted their children to attend Humble Beginnings, that Humble Beginnings was closing.

70.     For example, on the 20th day of January 2017, Kristin Harris, Social Worker, testified that her office was told to put subsidy children in another facility because Humble Beginnings Child Care Center, Inc. would be shut down, she stated that "upper management" told her it would close.

71.     Defendant Mebane, Supervisor at Currituck Social Services, DSS Supervisor, also participated in the concerted disparate treatment of African-American subsidized daycare providers in Currituck County, NC, namely Plaintiffs.

72.     That, upon information and belief, Defendant Mebane directed DSS employees to conduct an unproportioned amount of unannounced visits of Humble Beginnings and other African American daycares opposed to White/Caucasian owned daycare providers.

73.     Furthermore, DSS discriminated in its pay to Plaintiffs.   DSS refused to pay Plaintiffs second shift differentials as allocated by statute and contract, but paid white facility owners said differentials. DSS also cut Plaintiffs afterschool

program by refusing to submit repayment for those children enrolled and informed Plaintiffs that DSS eliminated its afterschool program while issuing payments to white-owned facilities.

74. As a result of DSS treatment and actions towards Humble Beginnings and New Beginnings, they are the only licensed childcare providers in Currituck County that North Carolina Division of Child Development and Early Education ("DCDEE") has not taken adverse action against in the last three years.

### *Defendant White and DHHS Harassed Plaintiffs*

75. That, upon information and belief, on approximately the 23rd day of June 2014, Defendant White visited Humble Beginnings. During her visit, Defendant White entered the office of Plaintiff Gregory and opened her desk drawers, removing paperwork containing personal information such as Social Security Numbers of the children attending Humble Beginnings, and financial information of said children's parents, and laid them out in the hallway to review, upsetting the parents who were there and witnessing her actions.

76. That, upon information and belief, the parents of three children withdrew their children from Humble Beginnings due to Defendant White's actions of impermissibly reviewing the personal information of the parents and children.

77. That, upon information and belief, while visiting Humble Beginnings, Defendant White asked Andrew Whimslett, a Caucasian man, and teacher at Humble Beginnings, to lie about the number of children enrolled in his class for the sole purpose to violate the Plaintiff,  however, he refused.

78. That, after Defendant White's visit on the 23rd day of June 2014, Plaintiff Gregory contacted Lois Harrington ("Ms. Harrington"), supervisor of Defendant White, and inquired on the reasoning behind the numerous unannounced visits, and complained of Defendant White's behavior.

79. That, Ms. Harrington, informed Plaintiff Gregory that she was unaware of the numerous visits by Defendant White to Humble Beginnings, and informed Plaintiff Gregory that she would confront Defendant White regarding her actions.

80. Despite Plaintiff Gregory's report, Defendant White's harassment continued, and the continuation thereof was also reported to Ms. Harrington.

81. That, upon information and belief, on approximately the 21st day of July 2014, Plaintiff Gregory witnessed Defendant White slowly driving by her house in a state-issued vehicle before speeding off, after being recognized by Plaintiff Gregory and her son. There are no daycare providers within the vicinity of Plaintiff Gregory's house.

82. Defendant White's egregious actions towards Humble Beginnings were not imposed upon the similarly situated White/Caucasian daycare providers. Defendant White's actions included driving by Plaintiff's house, assaulting Plaintiff's daughter, surreptitiously accessing files that possessed confidential information of the Plaintiff's daycare clients, trespassing by attempting to break in Plaintiff's car and facility, and excessive unannounced visits amongst many other appalling actions by Defendant White.

### The County Discriminated Against Plaintiffs by way of a Fire Inspection/Building Inspection

83.　That, upon information and belief, in 2014, Plaintiff Gregory attempted to get a license from DCDEE for the MSCC to operate a summer camp program with subsidized children in Currituck County.

84.　MSCC was unable to receive licensing until it passed a Fire inspection, Safety inspection, and a Sanitation inspection, all to be performed by Currituck County.

85.　From its inception in June of 2014, Fire Inspector Defendant Mims, a White/Caucasian male, refused to perform a fire inspection on MSCC.

86.　In fact, Defendant Mims implemented a *new* rule to substantiate his reason for not performing the necessary inspection. Defendant Mims stated that he would not perform a fire inspection until Plaintiff Gregory passed a  safety/building inspection.

87.　Upon information and belief, in 2014, no law, rule or regulation in North Carolina required that a daycare provider must pass a safety/building inspection before a fire inspection.

88.　Defendant Mims did not require White/Caucasian owned daycare providers to pass a safety/building inspection before a fire inspection.

89.　Upon information and belief, Currituck County Chief Building Inspector Defendant Newns, refused to pass a safety/building inspection on MSCC because MSCC had improper door knobs.

90.     Upon information and belief, Defendant Newns informed Plaintiff of the type door knobs that were required at MSCC to passed a safety/building inspection. Subsequently, Plaintiff notified the building owner Brain Innis, a White/Caucasian male, concerning the type of doorknobs that were required to be installed at MSCC per Defendant Newns instruction. Mr. Innis purchased the required door knobs and had them installed at MSCC.

91.     Defendant Newns stilled refused to pass a safety/building on MSCC after the proper doorknobs were installed.

92.     Upon information and belief, Defendant White interfered with the inspection of MSCC.

93.     Upon information and belief, Defendant's actions were racially motivated.

94.     Therefore, Mr. Innis stepped in and requested an inspection.

95.     On the 13th day of April 2015, Mr. Innis, a White man, oversaw the safety inspection performed by Defendant Newns at that time MSCC passed the safety/building inspection.

96.     Upon information and belief, at the time of building/safety inspection on April 13, 2015, Defendant Newns informed Mr. Innis that he would only pass the inspection for him and not Plaintiff Gregory.

97.     Because of the discriminatory treatment and extended delay, Plaintiff Gregory was unable to proceed with the establishment of the afterschool program, and she defaulted on the lease.

## *Cancelation of Humble Beginnings Food Program*

98.    That, upon information and belief, on approximately the 19th day of July 2016, at or four o'clock (4:00) a.m., Humble Beginnings was broken into and had office doors, and file drawers forced open resulting in confidential and sensitive materials being stolen.

99.    That, during the burglary, the perpetrator attempted to send a fax from Humble Beginnings to the DSS at 4:13 a.m., as shown by a fax report that was printed.

100.    Plaintiff filed a report with the Currituck County Sherriff's Department suspecting someone from Defendant DSS's office was responsible for the burglary; however, the Sheriff's Department never completed an investigation.

101.    That, among the paperwork stolen from Humble Beginnings, there were over forty (40) Income Eligibility Applications ("IEA") containing sensitive information of the children attending Humble Beginnings, and their parents.

102.    That, upon information and belief, the next day, on approximately the 20th day of July 2016, Angela Cret, a Caucasian woman, and representative of the Food and Nutrition Division of the Food Program for DHHS visited Humble Beginnings to audit the Food Program, requesting all IEAs.

103.    That, due to the stolen IEAs, the Food Program of Humble Beginnings was sanctioned by DSS. DSS also stated that Plaintiff Gregory was spending over the budget authorized. This finding was unsubstantiated.

104.    DSS used the burglary as pretext to sanction Plaintiffs.

*Plaintiffs Reported the Discrimination*

105.   In April 2012, Plaintiffs report to Defendant White's supervisor, Ms. Harrington, that they were unfairly scrutinized by Defendant White.

106.   In July 2014, Plaintiffs reported to DCDEE that Defendant White behaved discriminatorily and had invaded her personal space and property, in addition to her clients' confidential information by rummaging through private documents.

107.   In July 2014, Plaintiffs reported to Defendant White's supervisor, Ms. Harrington, that Defendant White had exhibited disorderly conduct in her facility in response to Plaintiffs' report of discrimination. Plaintiffs requested that Defendant White not return to her property.

108.   In August 2014, Plaintiff Gregory reported Defendant White's harassment to DHHS by written grievance.

109.   In response to Plaintiffs' plentiful reports, DHHS failed to investigate or respond, and, in fact, wrongfully instituted administrative action against Plaintiffs.

110.   In addition, DSS retaliated and diverted funds from Plaintiffs.

111.   Defendants' retaliation did not stop. In January 2015, DSS diverted over $18,000 from Plaintiffs, absent notice, hearing or opportunity to be heard.

112.   In February 2015, Plaintiff Gregory reported DSS' unconstitutional diversion of her profits to the Board of Directors of Social Services.

113. Again, in response to Plaintiff Gregory's complaint, no action was taken, but rather, DHHS and DSS retaliated against her. On March 15, 2015, Defendant White conducted an unannounced visit.

114. Plaintiff Gregory made a litany of additional written and verbal complaints to DSS and DHHS that those Defendants failed to address.

115. Furthermore, Plaintiff Gregory reported Defendants Mims and Newns discrimination to the County Manager. The County took no action.

116. As a final matter, Mr. Innis reported Defendants' behavior to discrimination to Representative Bob Steinberg ("Representative Steinberg").

117. Plaintiff Gregory followed with her report of Defendants' discrimination to Representative Steinberg and former Governor Roy Cooper.

### *Defendants Close Humble Beginnings*

118. Because Defendants could not shut Humble Beginnings down through factious write-ups and citations and blockage of expansions, they employed outside resources to drain Plaintiffs of funds.

119. Defendant White contacted the North Carolina Secretary of State (the "SOS") and requested a review of Humble Beginnings' corporate status.

120. Subsequently the North Carolina Department of Revenue put a hold on Humble Beginnings' bank account and Plaintiff Gregory's personal bank account.

121. September 2016, DHHS send Plaintiffs notice of intent to revoke Plaintiff Gregory's child care license and indicated reason was suspended articles of incorporation with the SOS.

122.     DHHS amended its notice of revocation to issue a written warning and indicated a new reason for the threat of revocation, which was failure to pay business taxes. Upon information and belief, White-owned facilities owed more taxes that Plaintiffs. Plaintiffs requested an appeal that was not provided in violation of due process.

123.     DSS interfered with Plaintiffs' payment by misrepresenting that it owned Humble Beginnings.

124.     DSS unilaterally withdrew children from the Facility and threatened to place children in foster care and terminate parental rights. In 2016, the judge in the matter cautioned DSS to stop spreading mistruths about Humble Beginnings and interfering with its business in open court.

125.     In 2017, Defendant White attempted to conduct an illegal search of Plaintiff Gregory's vehicle, damaging the locks on her car. Plaintiff Gregory reported the behavior to the Magistrate who threw sworn affidavits in the trash and informed Plaintiff Gregory to take it up in civil court.

126.     Defendant White interfered with Plaintiffs' lease, causing the landlord to issue a notice on March 31, 2018, indicating that the lease would not be renewed.

127.     Plaintiff Gregory made an attempt to find an alternative locations but the County would not pass either building during inspection, even though immediately prior to all locations were licensed child-care facilities.

128.     Subject to Defendant White's interference, Humble Beginnings closed on June 30, 2018.

129.    The Property was re-let to a White individual.

### *Defendants' Harassment After They Closed Humble Beginnings*

130.    Even after the closure, Defendant White instigated felony charges against Plaintiff Gregory related to Defendant White's attempt to break into Plaintiff Gregory's vehicle, even though Plaintiff Gregory was prevented from pressing charges against Defendant White for her own vehicle. Defendant White maliciously reported that Plaintiff Gregory had filed a false insurance claim related to Defendant White's intrusion.

131.    August 2019, Plaintiff Gregory found employment at a licensed child care center. Defendant White was furious and the inference was that Plaintiff Gregory be terminated. Days after being hired, Plaintiff Gregory's employer terminated her employment for a pretextual reason.

### *Defendants Did Not Treat White People Similarly to Plaintiff*

132.    White childcare owners were treated with respect and dignity.

133.    Defendant Romm asked Plaintiff Gregory to segregate children that would have led to a racial division.

134.    White childcare owners were paid second-shift differentials and for transportation costs.

135.    Children at White childcare facilities faced far serious injuries, but those facilities were not placed out of business. At least one White-owned facility:

    a.  Had a child drown, and the owner obtained license.

b. Receive third-degree burns from kitchen equipment, and the owner obtained license.

136. Despite that Humble Beginnings had more certified and credentialed staff (White and African-American) than White-owned facilities, Defendants treated it as a lesser facility.

### *Damages*

137. As the foreseeable, direct and proximate result of Defendants' conduct, acts and omissions, Plaintiffs have and will continue to suffer actual and consequential economic damages and non-economic damages in amounts not presently known.

138. Plaintiff Gregory's career progress and opportunity to earn future income has been substantially damaged. Defendants' conduct in bringing Plaintiffs' business to a halt has aggravated Plaintiffs' economic injuries. Plaintiff Gregory has applied for childcare work to no avail:

a. Albemarle Alliance hired Plaintiff Gregory, but days later terminated her;

b. When Defendant White found out that Albemarle Alliance hired Plaintiff Gregory, Defendant White informed the owner of Albemarle Alliance that she would not communicate with Plaintiff Gregory and refused to visit the center because of such hire; and

     c.  As a result, Albemarle Alliance informed Plaintiff Gregory that it did not want Defendant White interfering with its star rating, and therefore, would have no choice but to dismiss Plaintiff Gregory;

     d.  Plaintiff Gregory was dismissed within less than two weeks of the date of hire.

139.   Albemarle Alliance was the first job Plaintiff Gregory was able to find in two (2) years.

140.   Because Plaintiff Gregory cannot find comparable childcare work, she has been reduced to accept any type of employment.

141.   Also, due to the nature of the felony charges that were initiated against Plaintiff Gregory, she had to hire representation and was unable to renew her childcare license.

142.   Plaintiff Gregory has and will continue to suffer humiliation and severe emotional distress and related loss of enjoyment of life.

143.   The conduct of Defendants was intentional, as they corroborated, planned and sought to drive Plaintiffs out of business solely because she was African-American and filed a complaint for discrimination.

144.   Defendants' conduct in bringing Plaintiffs' business and career to a halt is mental cruelty and has and will continue to cause Plaintiff Gregory to suffer substantial emotional distress and mental suffering.

145.   As a result of Defendants' actions, Plaintiffs have suffered and will continue to suffer irreparable harm.

# CLAIMS FOR RELIEF

## Count I
## Violation of 42 U.S.C. § 1985
## Conspiracy to Interfere with Civil Rights
## (Against All Defendants)

146.    Plaintiffs re-allege the preceding paragraphs as if set forth fully herein.

147.    Section 1985 of the Civil Rights Act of 1870, 42 U.S.C. §1985, as amended ("Section 1985"), provides liability:

> If two or more persons in any State or Territory conspire, or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws, or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws . . . in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages, occasioned by such injury or deprivation, against any one or more of the conspirators.

148.    Defendants are persons within the United States.

149.    African-American women are persons entitled to equal protection and privileges of the laws of the United States.

150.    Defendants, by their actions as hereinbefore alleged, have conspired for the purpose of impeding, hindering, obstructing, depriving or defeating the right of African-American women to equal protection and privileges of the laws.

151.     Defendants have undertaken acts in furtherance of this conspiracy by depriving African-American women the right to be free from discrimination and equal treatment under the privileges and laws.

152.     All Defendants' actions were necessary to Plaintiffs' constitutional deprivations.

153.     Without limitation, as acts or omissions constituting disparate and discriminatory treatment, Defendants failed to provide:

    a.  Equality in the protection of confidential records;

    b.  The right to be critiqued fairly;

    c.  Equality in treatment, business expansion and contracts;

    d.  Right to be free from race-based harassment;

    e.  The right to be treated with respect and dignity;

    f.  The right to privacy;

    g.  The right to due process of law;

    h.  Right to manage financial affairs; and

    i.  The right to be free from unlawful deprivation of liberty;

154.     As alleged throughout this Complaint, Defendants knowingly and intentionally discriminated against Plaintiffs based on race and gender.

155.     The conduct of Defendants was intentional or in reckless disregard to Plaintiffs' rights under § 1985.

156.     As the direct and proximate result of Defendants' violations of § 1985(c), Plaintiff Gregory has also suffered substantial non-economic damages

including, without limitation, emotional and physical suffering and distress, humiliation, and intangible injury from the deprivations of civil rights.

157. The discriminatory conduct of Defendants continued despite Plaintiffs' protestations.

158. Defendants' discriminatory conduct was intentional and malicious, making it necessary to award punitive or exemplary damages to punish them and deter other review agencies with supervisory conduct from like misconduct.

**Count II**
**Violation of 42 U.S.C. § 1983**
**Interference with Civil Rights, Disparate Treatment**
**(Against All Defendants)**

159. Plaintiffs re-allege the preceding paragraphs as if set forth fully herein.

160. 42 U.S.C. § 1983 provides that:

Every person, who under color of any statute, ordinance, regulation, custom or usage of any state or territory or the District of Columbia subjects or causes to be subjected any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the constitution and law shall be liable to the party injured in an action at law, suit in equity, or other appropriate proceeding for redress . . . .

161. At all times relevant, Defendants acted under color of law.

162. Defendants engaged in disparate treatment, denying Plaintiffs the enjoyment of the benefits, privileges, terms, and conditions of their business relationship because of her race.

163.    Without limitation, as acts or omissions constituting disparate treatment, Defendants denied:

a.    Her right to privacy;

b.    Right to be treated fairly;

c.    Right to be free from unlawful restraint and detention;

d.    Right to be treated with respect and dignity;

e.    Right to due process; and

f.    Right to be free from illegal searches and seizures.

164.    As alleged throughout this Complaint, Defendants knowingly and intentionally discriminated against Plaintiffs because of their race and gender.

165.    The conduct of Defendants was intentional or in reckless disregard to Plaintiffs' rights under § 1983.

166.    As the direct and proximate result of the Defendants' violations of § 1983, Plaintiff Gregory has also suffered substantial non-economic damages including, without limitation, emotional and physical suffering and distress, humiliation, and intangible injury from the deprivations of civil rights.

167.    The discriminatory conduct of the Defendants continued despite Plaintiffs' protestations.

168.    Defendants' discriminatory conduct was intentional and malicious, making it necessary to award punitive or exemplary damages to punish them and deter other review agencies from like misconduct.

**Count III**
**Violation of 42 U.S.C. § 1983**

## Interference with Civil Rights, Retaliation
## (Against All Defendants)

169. Plaintiffs re-allege the preceding paragraphs as if set forth fully herein.

170. Defendants retaliated against Plaintiffs for filing complaints internally and externally that assert racial discrimination against them.

171. Individual Defendants' acts are imputed against their respective employers under the doctrine of respondeat superior regarding the acts and omissions as alleged in Paragraphs 166, 167 and 168, *infra*.

172. Defendant White retaliated against Plaintiffs when they complained that he had been discriminated against because of race and gender, unfairly critiquing Plaintiffs. In addition, Defendant White retaliated against Plaintiffs by discriminatorily evaluating Plaintiffs. Defendant White also retaliated against Plaintiffs for engaging in statutorily protected behavior by informing those under her influence the nature and extent of Plaintiffs' complaints and requesting that they partake in discriminatory behavior. Moreover, Defendant White retaliated against Plaintiffs by forcing the closure of the Facility. Finally, Defendant White retaliated against Plaintiff Gregory by interfering with future employment options and interfering with the business contracts and ventures of Humble Beginnings.

173. Defendants Romm and Mebane retaliated against Plaintiffs by providing unwarranted and prejudicial criticisms and unequal pay. Defendants Romm and Mebane also retaliated against Plaintiffs by interfering with the number of children enrolled at the Facility. Furthermore, Defendants Romm and Mebane

retaliated against Plaintiffs when they participated in the forcing of the closure of Humble Beginnings because she filed discrimination complaints. Finally, Defendants Romm and Mebane retaliated against Plaintiffs when they unfairly diverted Plaintiffs' profits from her Facility.

174. Defendants Mims and Newns retaliated against Plaintiffs when they failed to conduct a proper inspection of Plaintiffs' newly leased facilities in response to a complaint that Plaintiffs lodged against Defendant White.

175. DHHS and County Defendants retaliated against Plaintiffs by its acts or omissions in response to Plaintiffs' complaints and grievances that emboldened their respective employees to continue to discriminate against Plaintiffs in violation of the law.

176. The conduct of Defendants was intentional or in reckless disregard to Plaintiffs' rights.

177. As the direct and proximate result of the Defendants' violations of Section 1983, Plaintiffs have suffered substantial damages including, without limitation, actual and consequential damages for economic loss in amounts that will be proven at trial.

178. As the direct and proximate result of the Defendants' violations of Section 1983, Plaintiff Gregory has also suffered substantial non-economic damages, including without limitation, emotional and physical suffering and distress, humiliation, and intangible injury from the deprivations of civil rights.

179.     The unlawful retaliation by Defendants continued despite Plaintiffs'
protestations.

180.     Defendants' unlawful retaliation was intentional and malicious,
making it necessary to award punitive or exemplary damages to punish them and
deter other law enforcement agencies from like misconduct.

181.     Defendants constituting unlawful retaliation was intentional and
malicious, making it necessary to award punitive or exemplary damages to punish
the state actors in similar positions of authority from like misconduct.

**Count IV**
**Tortious Interference with Employment and Related Opportunities**
**(All Defendants)**

182.     Plaintiffs re-allege the preceding paragraphs as if set forth fully
herein.

183.     Plaintiffs had a contractual relationship with DSS, DHHS, parents and
employers under North Carolina common law pursuant to several independent
contracts.

184.     Defendants were not parties to one another's contractual relationship
with Plaintiffs, but they knew of the contractual relationship.

185.     These Defendants also knew that Plaintiffs enjoyed justified
expectations in their employment relationship, including opportunities to progress,
maintain his life and health, develop a strong reputation in the community, and
enjoy substantially enhanced income.

186.    Defendants interfered with Plaintiffs' employment and related opportunities by discriminating against them, creating a hostile environment, retaliating against them, and spreading untruths about their performance for reasons unrelated to any legitimate business interest and for their personal enjoyment, gain, insecurities, and biases.

187.    Defendants interfered with Plaintiffs' contract by informing County employees to thwart Plaintiffs' expansion.  .

188.    These Defendants' interference with Plaintiffs' business and related opportunities was based on actual and legal malice towards Plaintiffs.

189.    These Defendants' interference with Plaintiffs' employment and related opportunities was unjustifiable.

190.    These Defendants' conduct directly and proximately caused Plaintiffs to suffer actual damages both economic and non- economic.

191.    Plaintiffs may also may recover punitive damages in an amount to be determined at trial, under N.C. Gen. Stat. § 1D-15.

## Count V
## Negligent Retention and Negligent Supervision
### (Against The County, DHHS and DSS)

192.    Plaintiffs re-allege the preceding paragraphs as if set forth fully herein.

193.    Defendants knew or should have known of their respective employees' discriminatory conduct towards Plaintiffs.

194.    Despite having knowledge of their respective employees' racism and discrimination towards Plaintiffs, Defendants retained the employment of them.

195.    217.    Further Individual Defendants failed to properly supervise their respective employees.

196.    Defendants' lack of supervision enabled a racially charged environment to fester and impact Plaintiffs' business.

## Count VI
### Breach of Fiduciary Duty
### (The County, DHHS and DSS)

197.    Plaintiffs re-allege the preceding paragraphs as if set forth fully herein.

198.    Defendants owed Plaintiffs fiduciary duties in the exercise of their licensure and representation financial affairs.  Because Defendants entered into a fiduciary relationship with Plaintiffs, they were bound to act with the utmost good faith and to her benefit.

199.    Defendants breached their fiduciary duties to Plaintiffs by, among others, interfering with their business interest and acting in the best interest of themselves.

200.    Plaintiffs have been damaged in an amount to be established at trial as a result of Defendants' breaches.

## Count VII
### Unfair and Deceptive Trade Practices N.C.G.S. § 75-1.1
### (All Defendants)

201.    Plaintiffs re-allege the preceding paragraphs as if set forth fully herein.

202.    Defendants committed an unfair and deceptive trade practice in the regulation and interference with Plaintiff's Facility in violation of N.C.G.S. § 75-1 *et. seq.*

203.    Defendants' actions were, fraudulent, unfair and deceptive.

204.    Defendants' actions were in or affected commerce.

205.    Defendants' fraudulent actions injured Plaintiffs.

206.    Each Defendant owed Plaintiffs a duty in the evaluation of the Facility. DHHS and DSS owed a duty of care and disclosure as provided under the statutes that govern the regulation of childcare facilities. The County owed Plaintiffs a duty of care and disclosures as individuals who are placed in positions to evaluate the sufficiency and compliance of prospective business entities fairly.

207.    Defendants breached their non-delegable duties to Plaintiffs and caused the closure of her Property for their own benefit.

208.    Defendants also omitted material facts to materially mislead Plaintiffs in an effort to cause confusion.

209.    Had Defendants disclosed material facts, Plaintiffs would have not entered into contracts and Plaintiffs would have made certain reports.

210.    Defendants' unfair, deceptive and unconscionable representations, concealments and omissions were reasonably calculated to deceive Plaintiff and the public.

211.     Defendants' violations of federal law and state law constitute *per se* violations of Chapter 75-1.

212.     Defendants' actions were directed toward Plaintiffs and proximately injured her.

213.     Plaintiffs seek all damages pursuant to Chapter 75-1, et. seq., including attorney's fees, for injuries sustained because of Defendants' violation of statutory and common law, and all equitable relief as allowed by law, including restitution, disgorgement of profits, compensatory and punitive damages, and all damages allowed by law to be paid by Defendants, including pre- and post-judgment interest.

## Count VIII
## Breach of Contract and Badfaith
### (Against All Defendants)

214.     Plaintiffs re-allege the preceding paragraphs as if set forth fully herein.

215.     The statutory scheme established by the legislature creates an agreement that constitutes a contract.

216.     Defendants breached the agreement when it behaved discriminatorily and acted in bad faith in the evaluation of Humble Beginnings.

217.     Defendants also acted in bad faith when they corroborated to deprived Plaintiffs of their contract benefits.

218.     Defendants' breaches were material.

219.     Defendants' breaches caused Plaintiffs to suffer damages.

**Count IX**
**Punitive Damages**
**(All Defendants)**

220.   Plaintiffs re-allege the preceding paragraphs as if set forth fully herein.

221.   Each Defendant committed or participated in outrageous, willful, wanton, malicious, and wrongful conduct they knew or should have known was reasonably likely to result in injury, damage, or other harm to Plaintiffs, and was in flagrant and reckless disregard of Plaintiffs' rights.

222.   Because of each Defendants' willful, wanton, outrageous, and egregiously wrongful conduct, Plaintiffs may recover punitive damages (in addition to actual and consequential damages) against each Defendant, in an amount to be determined by the trier of fact, under the United States Constitution, the North Carolina Constitution, the North Carolina General Statutes, and common law.

**<u>Prayer for Relief</u>**

**WHEREFORE**, Plaintiff demands judgment be entered on his behalf against Defendants and grants the following relief:

A.  An award of compensatory damages for Plaintiffs, in an amount of to be determine by the enlightened conscience of the trier of fact, jointly and severally, against Defendants;

B.  An award of pre-judgement and post-judgment interest;

C.  An award of costs, including, but not limited to, discretionary costs;

D.  Attorneys' fees and expenses incurred in pursuing this case under

all applicable federal and state statutes;

E.  Any other and further relief this Court deems just and proper; and

F.  Any other and further relief to which they may be entitled.

With respect to Plaintiff's Count IX for punitive damages, Plaintiffs requests judgment against Defendants for:

A.  Punitive damages sufficient to punish each Defendant and deter others from like misconduct;

B.  Costs of suit; and,

C.  Such other relief available under law and deemed just and proper.

## JURY TRIAL DEMANDED

1.  Plaintiffs demands trial by jury in open court on all Counts. Respectfully submitted this 2nd day of May, 2020.

PLAINTIFF,

KENISHA GREGORY

By their Attorneys:

s/Sharika M. Robinson

SHARIKA M. ROBINSON,
North Carolina Bar No.: 44750
THE LAW OFFICES OF SHARIKA M ROBINSON,
PLLC
10230 Berkeley Place Drive, Suite 220
Charlotte, NC 28262
Telephone: (704) 561 6771
Telefax:      (704) 561-6773
srobinson@sharikamrobinsonlaw.com
*Counsel for Plaintiffs*

Harry M. Daniels, Jr., Esq.
Georgia Bar No.: 234158
DANIELS & JAMES, LLC
233 Peachtree St. NE Ste. 1200
Atlanta, GA 30303
Tel. 678.664.8529
Fax. 800.867.5248
daniels@danielsjameslaw.com
*Special Counsel for Plaintiffs*